# NORMAN ET AL. *v.* REED ET AL.

No. 90–1126.   Argued October 7, 1991—Decided January 14, 1992*

*Together with No. 90–1435, *Cook County Officers Electoral Board et al.* v. *Reed et al.,* also on certiorari to the same court.

280

Souter, J., delivered the opinion of the Court, in which Rehnquist, C. J., and White, Blackmun, Stevens, O'Connor, and Kennedy, JJ., joined. Scalia, J., filed a dissenting opinion, *post*, p. 296. Thomas, J., took no part in the consideration or decision of the cases.

*R. Eugene Pincham* argued the cause and filed briefs for petitioners in No. 90–1126.

*Kenneth L. Gillis* argued the cause for petitioners in No. 90–1435. On the briefs were *Jack O'Malley, Burton Stephen Odelson,* and *Mathias William Delort.*

*Gregory A. Adamski* argued the cause for respondents. With him on the brief for respondents Reed et al. was *Karen Conti.* Messrs. *O'Malley, Odelson,* and *Delort* filed a brief

for Cook County Officers Electoral Board, respondents in No. 90–1126.†

JUSTICE SOUTER delivered the opinion of the Court.

In these consolidated cases, we review a decision of the Supreme Court of Illinois barring petitioners in No. 90–1126 (petitioners) from appearing under the name of the Harold Washington Party on the November 1990 ballot for Cook County offices. We affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion.

I

Under Illinois law, citizens organizing a new political party must canvass the electoral area in which they wish to field candidates and persuade voters to sign their nominating petitions. Organizers seeking to field candidates for statewide office must collect the signatures of 25,000 eligible voters,[1] Ill. Rev. Stat., ch. 46, § 10–2 (1989), and, if they wish to run candidates solely for offices within a large "political subdivision" like Cook County, they need 25,000 signatures from the subdivision. *Ibid.* If, however, the subdivision itself comprises large separate districts from which some of its officers are elected, party organizers seeking to fill such offices must collect 25,000 signatures from each district. *Ibid.*[2] If the

---

†Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union of Illinois by *William T. Barker, Harvey M. Grossman, John A. Powell, Steven R. Shapiro,* and *Arthur N. Eisenberg;* and for the Committee for Party Renewal by *Robert E. Tait.*

[1] More precisely, they must collect the signatures of 25,000 voters or 1% of the number of voters at the preceding statewide general election, whichever is less. Ill. Rev. Stat., ch. 46, § 10–2 (1989). Given the State's population, the 25,000 signature requirement applies.

[2] The statute reads in relevant part:

"In the case of a petition to form a new political party within a political subdivision in which officers are to be elected from districts and at-large, such petition shall consist of separate components for each district from which an officer is to be elected. Each component shall be circulated only

organizers collect enough signatures to place their candidates on the ballot, their organization becomes a "new political party" under Illinois law, and if the party succeeds in gathering 5% of the vote in the next election, it becomes an "established political party," freed from the signature requirements of § 10–2. *Ibid.* A political party that has not engaged in a statewide election, however, can be "established" only in a political subdivision where it has fielded candidates. A party is not established in Cook County, for example, merely because it has fared well in Chicago's municipal elections.

The Harold Washington Party (HWP or Party), named after the late mayor of Chicago, has been established in the city of Chicago since 1989. Petitioners were the principal organizers of an effort to expand the Party by establishing it in Cook County, and, as candidates for county office, they sought to run under the Party name in the November 1990 elections.

---

within a district of the political subdivision and signed only by qualified electors who are residents of such district. Each sheet of such petition must contain a complete list of the names of the candidates of the party for all offices to be filled in the political subdivision at large, but the sheets comprising each component shall also contain the names of those candidates to be elected from the particular district. Each component of the petition for each district from which an officer is to be elected must be signed by qualified voters of the district equalling in number not less than 5% of the number of voters who voted at the next preceding regular election in such district at which an officer was elected to serve the district. The entire petition, including all components, must be signed by a total of qualified voters of the entire political subdivision equalling in number not less than 5% of the number of voters who voted at the next preceding regular election in such political subdivision at which an officer was elected to serve the political subdivision at large."

The statute caps the 5% requirement for both district and subdivision petitions at 25,000 signatures, the number effectively required on statewide petitions. Cook County and its districts are so large that this cap applies to each.

Cook County comprises two electoral districts: the area corresponding to the city of Chicago (city district) and the rest of the county (suburban district).[3] Although some county officials are elected at large by citizens of the entire county, members of the county board of commissioners are elected separately by the citizens of each district to fill county board seats specifically designated for that district. While certain petitioners wished to run for offices filled by election at large, others sought to capture the county board seats representing the city and suburban districts of Cook County.

Because the Party had previously engaged solely in Chicago municipal elections, petitioners were obliged to qualify as a "new party" in Cook County in order to run under the Party name. Accordingly, § 10–2 required them to obtain 25,000 nominating signatures in order to designate candidates for the at-large offices. And since petitioners wished to field candidates for the county board seats allocated to the separate districts, they also had to collect 25,000 signatures from each district. Petitioners gathered 44,000 signatures on the city-district component of their petition, but only 7,800 on the suburban component.

After petitioners filed the petition with the county authorities and presented their slate of candidates for both at-large and district-specific seats, respondent Dorothy Reed and several other interested voters (collectively, Reed) filed objections to the slate with the Cook County Officers Electoral Board (Board or Electoral Board). The Board rejected most

---

[3] These are the current districts of Cook County. We have learned that in a November 1990 referendum, the voters of Cook County adopted an ordinance providing for the division of the county by 1994 into 17 districts, each of which will send one commissioner to the county board. This Court has been unable to secure any official record of the new ordinance, however. In any event, the parties have not treated this issue as having any bearing on our disposition of these cases, and we do not see how it could have.

of Reed's claims. First, it dismissed her contention that, because there was already an established political party named the "Harold Washington Party" in the city of Chicago, petitioners could not run under that name for the various county offices. Reed relied on the provision of Illinois law that a "new political party," which petitioners sought to form, "shall not bear the same name as, nor include the name of any established political party . . . ." Ill. Rev. Stat., ch. 46, § 10–5 (1989). The Board, however, suggested that a literal reading of § 10–5 would effectively forbid a political party established in one political subdivision to expand into others, and held that the provision's true purpose was "to prevent persons who are not affiliated with a party from 'latching on' to the popular party name, thereby promoting voter confusion and denigrating party cohesiveness." The Board found no such dangers here, as Timothy Evans, the only HWP candidate to run in Chicago's most recent municipal election, had authorized petitioners to use the Party name.

The Board also rejected Reed's claim that petitioners had failed to gather enough nominating signatures to run as a party for any Cook County office. While the Board found that their failure to gather 25,000 signatures from the suburbs disqualified those who wished to run for the suburban-district commissioner seats, it held that this failure was no reason under § 10–2 to disqualify the candidates running under the Party name for city-district and countywide offices. The Board observed that construing the statute to disqualify the entire Cook County slate on this basis would advance no valid state interest and would raise serious constitutional concerns.

Finally, the Board rejected Reed's claim that, under § 10–2, petitioners' failure to designate Party candidates for any of the judicial seats designated for either the city district, the suburban district, or the county at large disqualified the entire slate of candidates running under the Party name for all

county offices.[4]   It decided, among other things, that § 10–2 did not apply because the judgeships at issue were not offices of the same "political subdivision" as nonjudicial offices within Cook County.

On appeal, the Circuit Court of Cook County affirmed the Board's ruling on the use of the HWP name, but on grounds different from the Board's.   It ruled that while Evans had no statutory power to authorize the use of the Party name, § 10–2 implicitly confined the scope of § 10–5 to cases where two parties seeking to use the same name coexist in the same political subdivision.   Since Cook County and the city of Chicago are separate subdivisions, the Circuit Court found no violation of the Election Code.

The Circuit Court nonetheless held that under the plain language of § 10–2, petitioners' failure to obtain 25,000 signatures for the suburban-district candidates doomed the entire slate, and it alternatively held that petitioners' failure to list Party candidates for judicial office compelled the same result. For these two independent reasons, the Circuit Court reversed the Board.[5]

On review, the Supreme Court of Illinois held in a brief written order that § 10–5 prohibited petitioners from using the HWP name, and that their failure to gather enough signatures for the candidates in the suburban-district races disqualified the entire slate.   It expressly declined "to discuss other points raised on the appeal" and thus chose not to ad-

---

[4] Reed based her argument on what the parties call the "complete slate requirement" of § 10–2.   The parties occasionally use the same term in their discussion of a separate issue, whether petitioners' failure to collect sufficient signatures in the suburban district voids their entire slate.   For clarity, we avoid using the term altogether.

[5] The Circuit Court also held that petitioners' failure to gather 25,000 signatures for the candidates running under the Party name for office in the Metropolitan Water Reclamation District disqualified those candidates, but not the rest of the slate, because the Water Reclamation District was a separate political subdivision from Cook County.   This ruling was not appealed to the Illinois Supreme Court and is not before this Court.

dress the effect of petitioners' failure to list candidates for county judgeships. Three of the court's seven members dissented on the ground that the majority's construction of Illinois law irrationally and unconstitutionally suppressed the development of new political parties. The majority justices indicated that they would issue an explanatory opinion, but they never have.[6]

Petitioners then applied for a stay from JUSTICE STEVENS, who, in his capacity as Circuit Justice, ordered the mandate of the Illinois Supreme Court to be "stayed or, if necessary, recalled" pending further review by this Court. Order in No. A–309 (Oct. 22, 1990). On October 25, 1990, the full Court granted petitioners' application for stay pending the filing and disposition of a petition for certiorari, 498 U. S. 931, thereby effectively reviving the Electoral Board's decision and permitting petitioners to run under the Party name in the November 6, 1990, Cook County election. According to the undisputed representation of the Board, see Brief for Petitioners in No. 90–1435, p. 10, while none of the HWP candidates was elected, several did receive over 5% of the vote, thus fulfilling, if the election stands, a necessary and apparently sufficient condition for the Party's qualification as an "established political party" within all or part of Cook County at the next election.

In due course, petitioners filed a petition for certiorari in No. 90–1126, and the Board, a respondent in that action, filed its own petition in No. 90–1435.[7] We granted each on May 20, 1991. 500 U. S. 931 (1991).

## II

We start with Reed's contention that we should treat the controversy as moot because the election is over. We should

---

[6] Three of the four justices in the majority have left the court since the date of the order.

[7] Under Illinois practice, if the Board's decision is appealed, it joins the prevailing party in support of its own decision.

not. Even if the issue before us were limited to petitioners' eligibility to use the Party name on the 1990 ballot, that issue would be worthy of resolution as "'capable of repetition, yet evading review.'" *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969). There would be every reason to expect the same parties to generate a similar, future controversy subject to identical time constraints if we should fail to resolve the constitutional issues that arose in 1990.

The matter before us carries a potential of even greater significance, however. As we have noted, the 1990 electoral results would entitle the HWP to enter the next election as an established party in all or part of Cook County, freed from the petition requirements of § 10–2, so long as its candidates were entitled to the places on the ballot that our stay order effectively gave them. This underscores the vitality of the questions posed, even though the election that gave them life is now behind us.

### III

For more than two decades, this Court has recognized the constitutional right of citizens to create and develop new political parties. The right derives from the First and Fourteenth Amendments[8] and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences. See *Anderson* v. *Celebrezze,* 460 U. S. 780, 793–794 (1983); *Illinois Bd. of Elections* v. *Socialist Workers Party,* 440 U. S. 173, 184 (1979); *Williams* v. *Rhodes,* 393 U. S. 23, 30–31 (1968). To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of a corresponding interest sufficiently

---

[8] As in *Anderson* v. *Celebrezze,* 460 U. S. 780 (1983), "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment." *Id.,* at 786–787, n. 7.

weighty to justify the limitation, see *Anderson, supra,* at 789, and we have accordingly required any severe restriction to be narrowly drawn to advance a state interest of compelling importance. See *Socialist Workers Party, supra,* at 184, 186. By such lights we now look to whether §§ 10–2 and 10–5, as construed by the Supreme Court of Illinois, violate petitioners' right of access to the Cook County ballot.

## A

Reversing the judgment of the Circuit Court, the State Supreme Court held, under § 10–5, that the Cook County candidates could not claim to represent the HWP because there already was a party by that name in the city of Chicago. The court gave no reasons for so concluding beyond declaring that "petitioner[s'] use of the Harold Washington Party name in their petition . . . violate[d] the provisions of section 10–5," which, the court noted, "prohibits use of the name of an established political party." Thus, the issue on review is not whether the Chicago HWP and the Cook County HWP are in some sense "separate parties," but whether and how candidates running for county office may adopt the name of a party established only in the city.

While the Board based its answer to this question on a determination that the city HWP had authorized petitioners to use the Party name, the State Supreme Court's order seems to exclude the very possibility of authorization, reading the prohibition on the "use of the name of an established political party" so literally as to bar candidates running in one political subdivision from ever using the name of a political party established only in another. As both the dissent below and the opinion of the Board suggest, however, this Draconian construction of the statute would obviously foreclose the development of any political party lacking the resources to run a statewide campaign. Just as obviously, § 10–5, as the State's highest court apparently construed it,

is far broader than necessary to serve the State's asserted interests.

To prevent misrepresentation and electoral confusion, Illinois may, of course, prohibit candidates running for office in one subdivision from adopting the name of a party established in another if they are not in any way affiliated with the party. The State's interest is particularly strong where, as here, the party and its self-described candidates coexist in the same geographical area. But Illinois could avoid these ills merely by requiring the candidates to get formal permission to use the name from the established party they seek to represent, a simple expedient for fostering an informed electorate without suppressing the growth of small parties. Thus, the State Supreme Court's inhospitable reading of § 10-5 sweeps broader than necessary to advance electoral order and accordingly violates the First Amendment right of political association. See *Anderson, supra,* at 793–794; *Williams, supra,* at 30–34.

For her part, when Reed argues that the county Party, led by R. Eugene Pincham, is "different from" the Party established in the city of Chicago under the leadership of Timothy Evans, she may indeed be suggesting that the city Party failed to authorize the Cook County candidates to use the Party name. But Reed offers no support at all for that assumption, which stands at odds with what few relevant facts the record reveals. The Electoral Board found that Timothy Evans, the Party's most recent mayoral candidate in the city of Chicago, had specifically authorized petitioners' use of the Party name in Cook County. While acknowledging that Evans was not the statutory chairman of the Chicago Party, the Board ruled, and Reed does not dispute, that Evans, "as the only candidate of the Chicago HWP," was "the only person empowered by the Election Code to act in any official capacity for the HWP." We have no authoritative ruling on Illinois law to the contrary, and Reed advances no legal argument for the insufficiency of Evans' authorization.

To be sure, it is not ours to say that Illinois law lacks any constitutional procedural mechanism that petitioners might have been required to, but did not, follow before using the Party name. Our review of § 10–2 reveals the possibility that Illinois law empowers a newly established party's candidate or candidates (here, Evans) merely to appoint party "committeemen," whose authority to "manage and control the affairs" of the party might include an exclusive right to authorize the use of its name outside the party's original political subdivision. It seems unlikely, however, that the Supreme Court of Illinois had such reasoning in mind. Any limitation on Evans's power to authorize like-minded candidates to use the Party name would have had to arise under § 10–2, whereas the order below held simply that petitioners' use of the Party name "violate[d] the provisions of section 10–5." In any event, it is not this Court's role to review a state-court decision on the basis of inconclusive and unargued theories of state law that the state court itself found unworthy of mention.[9]

## B

As an alternative basis for prohibiting petitioners from running together under the Party name, the Supreme Court of Illinois invoked the statutory requirement of § 10–2 that "[e]ach component of the petition for each district . . . be signed by [25,000] qualified voters of the district . . . ." The

---

[9] Reed did seem to make a version of this argument in her brief to the Illinois Supreme Court. See Brief for Appellees Reed et al. in No. 70833 (Sup. Ct. Ill.), pp. 20–21. Moreover, in the one sentence that it devotes to the topic, the Circuit Court makes a similar observation: "While Timothy C. Evans was the only candidate of the Harold Washington Party, his only power, pursuant to § 10–2 of the Election Code, was the ability to appoint interim committeemen." See App. to Pet. for Cert. in No. 90–1435, p. 19a. Nonetheless, these passages are inadequate to prove that the Illinois Supreme Court adopted the argument, particularly since Reed arguably waived it by not raising it in her original "Objector's Petition" to the Electoral Board. See App. 14–15. There, she claimed only that petitioners' use of the Party name violated § 10–5.

court apparently held that disqualification of a party's entire slate of candidates is the appropriate penalty for failing to meet this requirement, and it accordingly treated petitioners' failure to collect enough signatures for their suburban-district candidates as an adequate ground for disqualifying every candidate running under the HWP name in Cook County.

This is not our first time to consider the constitutionality of an Illinois law governing the number of nominating signatures the organizers of a new party must gather to field candidates in local elections. In *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173 (1979), we examined Illinois's earlier ballot-access scheme, under which party organizers seeking to field candidates in statewide elections were (as they still are) effectively required to gather 25,000 signatures. See § 10–2. At that time, the statute separately required those organizing new parties in political subdivisions to collect signatures totaling at least 5% of the number of people voting at the previous election for offices of that subdivision. In the city of Chicago, the subdivision at issue in *Socialist Workers Party*, the effect of that provision was to require many more than 25,000 signatures. Although this Court recognized the State's interest in restricting the ballot to parties with demonstrated public support, the Court took the requirement for statewide contests as an indication that the more onerous standard for local contests was not the least restrictive means of advancing that interest. *Id.*, at 186.

The Illinois Legislature responded to this ruling by amending its statute to cap the 5% requirement for "any district or political subdivision" at 25,000 signatures. Thus, if organizers of a new party wish to field candidates in a large county without separate districts, and if 5% of the number of voters at the previous county election exceeds 25,000, the party now needs to gather only 25,000 signatures.

Under the interpretation of § 10–2 rendered below, however, Illinois law retains the constitutional flaw at issue in *Socialist Workers Party* by effectively increasing the signature requirement applicable to elections for at least some offices in subdivisions with separate districts. Under that interpretation, the failure of a party's organizers to obtain 25,000 signatures for each district in which they run candidates disqualifies the party's candidates in all races within the subdivision. Thus, a prerequisite to establishing a new political party in such multidistrict subdivisions is some multiple of the number of signatures required of new statewide parties. Since petitioners chose to field candidates for the county board seats allocated to the separate districts and, as required by state law, used the "component" (*i. e.*, district-specific) form of nominating petition, the State Supreme Court's construction of § 10–2 required petitioners to accumulate 50,000 signatures (25,000 from the city district and another 25,000 from the suburbs) to run any candidates in Cook County elections. The State may not do this in the face of *Socialist Workers Party*, which forbids it to require petitioners to gather twice as many signatures to field candidates in Cook County as they would need statewide.

Reed nonetheless tries to skirt *Socialist Workers Party* by advancing what she claims to be a state interest, not addressed by the earlier case, in ensuring that the electoral support for new parties in a multidistrict political subdivision extends to every district. Accepting the legitimacy of the interest claimed would not, however, excuse the requirement's unconstitutional breadth. Illinois might have compelled the organizers of a new party to demonstrate a distribution of support throughout Cook County without at the same time raising the overall quantum of needed support above what the State expects of new parties fielding candidates only for statewide office. The State might, for example, have required some minimum number of signatures from each of the component districts while maintaining the total

signature requirement at 25,000. But cf. *Moore* v. *Ogilvie*, 394 U. S. 814 (1969). While we express no opinion as to the constitutionality of any such requirement, what we have said demonstrates that Illinois has not chosen the most narrowly tailored means of advancing even the interest that Reed suggests.

Nor is that the only weakness of Reed's rationale. Illinois does not require a new party fielding candidates solely for statewide office to apportion its nominating signatures among the various counties or other political subdivisions of the State. See § 10–2; *Communist Party of Illinois* v. *State Bd. of Elections*, 518 F. 2d 517 (CA7), cert. denied, 423 U. S. 986 (1975). Organizers of a new party could therefore win access to the statewide ballot, but not the Cook County ballot, by collecting all 25,000 signatures from the county's city district. But if the State deems it unimportant to ensure that new statewide parties enjoy any distribution of support, it requires elusive logic to demonstrate a serious state interest in demanding such a distribution for new local parties. Thus, as in *Socialist Workers Party*, the State's requirements for access to the statewide ballot become criteria in the first instance for judging whether rules of access to local ballots are narrow enough to pass constitutional muster. Reed has adduced no justification for the disparity here.[10]

---

[10] To an extent, history explains the anomaly. *Moore* v. *Ogilvie*, 394 U. S. 814 (1969), together with the Seventh Circuit's decision in *Communist Party of Illinois* v. *State Bd. of Elections*, 518 F. 2d 517 (1975), left the ballot-access requirements for statewide elections less stringent, for the first time, than the requirements for any local ballot. These were the same legal developments, in fact, that led to the anomaly at issue in *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173 (1979). Yet, as we noted there, an explanation is not the same as a justification. *Id.*, at 187; see also *id.*, at 189 (STEVENS, J., concurring in part and concurring in judgment); *id.*, at 190–191 (REHNQUIST, J., concurring in judgment). "Historical accident, without more, cannot constitute a compelling state interest." *Id.*, at 187.

## C

Up to this point, the positions of petitioners and the Board have coincided. They diverge on only one matter: whether requiring the candidates for the suburban-district commissioner seats to obtain 25,000 nominating signatures from the suburbs unduly burdens their right to run for those seats under the Party name. Although petitioners suggest that their showing of support in the city district should qualify their candidates to represent the Party in all races within Cook County, in the absence of any claim that the division of Cook County into separate districts is itself unconstitutional, our precedents foreclose the argument. According to the Board's uncontested arithmetic, the 25,000 signature rule requires the support of only slightly more than 2% of suburban voters, see Brief for Respondent Board in No. 90–1126, p. 9, and n. 7, a considerably more lenient restriction than the one we upheld in *Jenness* v. *Fortson,* 403 U. S. 431 (1971) (involving a 5% requirement). Just as the State may not cite the Party's failure in the suburbs as reason for disqualifying its candidates in urban Cook County, neither may the Party cite its success in the city district as a sufficient condition for running candidates in the suburbs.

## IV

These cases present one final issue, which we are unable to resolve. Some of Cook County's judges are elected by citizens of the entire county, and others by citizens of the separate districts. In responding to Reed's objection that the HWP had not fielded candidates for any elected judicial offices in Cook County, the Circuit Court held that, under § 10–2, "the exclusion of judicial candidates on the slate was a failure to fulfill the 'complete slate requirement' of the Election Code." The court then overruled the Electoral Board and treated this failure as an alternative ground for invalidating the Party's entire slate.

We decline to consider whether that ruling was constitutional. The Supreme Court of Illinois itself did not address it and therefore did not decide whether, under Illinois law, the Party's omission of judicial candidates doomed the entire slate.[11] We therefore remand these cases to that court for its prompt resolution of this issue. See *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 277 (1984); see also *McCluney* v. *Jos. Schlitz Brewing Co.*, 454 U. S. 1071, 1073–1074 (1981) (STEVENS, J., dissenting).[12]

The judgment of the State Supreme Court is affirmed in part and reversed in part, and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS took no part in the consideration or decision of these cases.

JUSTICE SCALIA, dissenting.

In the absence of an opinion by the Illinois Supreme Court defending its own judgment, and lacking any clear alternative analysis presented by respondents, the Court accepts petitioners' characterization of these cases as involving

---

[11] Among other possibilities, the Supreme Court of Illinois might agree with the Board's conclusion that the judgeships at issue are not offices of the same "political subdivision" as nonjudicial offices within Cook County. That court might also construe the decision in *Anderson* v. *Schneider*, 67 Ill. 2d 165, 365 N. E. 2d 900 (1977), to hold that an omission of judicial candidates should not invalidate the rest of the slate.

[12] To restate our conclusion, any rule, whether or not denominated the "complete slate" requirement, see, *e. g., post*, at 298, 299 (dissenting opinion's use of the term in this context); App. to Pet. for Cert. in No. 90–1435, pp. 23a–24a (Circuit Court's use of the term in this context), that disqualifies petitioners' entire slate for failure to collect 25,000 signatures wholly from the suburban district would be unconstitutional for the reasons given in Part III–B above. We express no opinion as to the constitutionality of a "complete slate requirement" that would invalidate petitioners' slate for their failure to field judicial candidates.

straightforward application of our decision invalidating a previous version of the Illinois election law, *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173 (1979). That characterization is in my view wrong, and leads to the wrong result. No proper basis has been established in these cases for interfering with the State of Illinois' arrangement of its elections.

*Socialist Workers Party* involved a challenge to Illinois' then-requirement that, in elections for offices in political subdivisions of the State, new political parties (and independent candidates) had to obtain the signatures of 5% of the number of persons who voted at the previous election for those offices, no matter how high that number might be—even though new parties could qualify for *statewide* elections by gathering only 25,000 signatures. See *id.*, at 175–176. The Socialist Workers Party objected to having to collect over 60,000 signatures to run a candidate in the Chicago mayoral election. See *id.*, at 177. We held that, although the State had a legitimate interest in ensuring that a party or independent candidate had a " 'significant modicum of support,' " there was "no reason" justifying a requirement of greater support for Chicago elections than for statewide elections. *Id.*, at 185–186.

The Court contends that the current Illinois law, as interpreted by the Illinois Supreme Court, suffers from the same "constitutional flaw": It "effectively increas[es] the signature requirement applicable to elections for at least some offices in subdivisions with separate districts [because] the failure of a party's organizers to obtain 25,000 signatures for each district in which they run candidates disqualifies the party's candidates in all races within the subdivision." *Ante*, at 293. Thus, "a prerequisite to establishing a new political party in such multidistrict subdivisions is some multiple of the number of signatures required of new statewide parties." *Ibid.*

This analysis serves only to demonstrate why *Socialist Workers Party* is distinguishable. There is no heightened

signature requirement (as there was in *Socialist Workers Party*) for any single office; each candidate (and the party) for each district election and each countywide election need obtain no more than 25,000 signatures. What creates "effectively," as the Court says, a sort of heightened signature minimum is the requirement that a new party run a "complete slate," *i. e.*, a candidate in each of the subdivision's districts. By virtue of that requirement, no one can run *as a new-party candidate* in any district unless there are not only 25,000 signatures for him in his own district, but also 25,000 votes for the party's candidate in each of the other districts. Such indirect consequences of a "complete slate" requirement were, of course, not at issue in *Socialist Workers Party*, which involved a single election for an at-large position. Thus, *Socialist Workers Party* is not at all dispositive of these cases.

It seems clear that the "complete slate" rule advances a legitimate state interest. It is reasonable to require a purported "party," which presumably has policy plans for the political subdivision, to run candidates in all the districts that elect the multimember board governing the subdivision. Otherwise, it is less a "party" than an election committee for one member of the board. The Court ultimately concedes this, and concedes that this state interest was *not* involved (and therefore *not* taken into account) in *Socialist Workers Party. Ante*, at 293–294. It nonetheless argues that this makes no difference, because: (1) Illinois could have achieved its interest in multidistrict support for the party by requiring that some proportion of the total signatures be from each district, but requiring no more than a 25,000 total, *ibid.;* and (2) multidistrict support is not an interest that Illinois considers important, since it "does not require a new party fielding candidates solely for statewide office to apportion its nominating signatures among the various counties or other political subdivisions of the State," *ante*, at 294.

I find neither response persuasive. As to the first: We did not say in *Socialist Workers Party* that the constitutionally permissible number for qualification in the various political subdivisions of the State had to be some fraction (presumably based on population) of the statewide 25,000 figure; to the contrary, we permitted the State to require in political subdivisions any number *up to* 25,000. Illinois has simply taken us at our word. Nor does this amount to an irrational failure to "apportion." Illinois' genuine *minimum,* we must recall, is a percentage (5%) of the votes in the prior election, which of course automatically adjusts for the size of the electoral unit. The 25,000 figure is simply a *cap* upon that minimum, and it is not at all reasonable to think an "apportionment" of that cap will assure serious voter support. As to the second argument: The fact that Illinois does not require geographic distribution of support for statewide office is irrelevant. Neither does it require geographic distribution, as such, in these Cook County elections. It does not care if all of the support for the Harold Washington Party, in each districtwide election, comes from a single ward—just as it does not care, in statewide elections, if all of a new party's support comes from a single county. What the law under challenge here reflects is not concern for *geographically distributed support,* but concern for *serious support in each election;* and when some of the elections are not at large but by district, the support must exist within each district.

Perhaps there are reasons why Illinois' "complete slate" requirement for political subdivisions is constitutionally invalid. The point might be made, for example, that the absence of any such requirement in statewide elections demonstrates (to take the Court's language erroneously addressed to a different point) that Illinois "deems [the requirement] unimportant," and has no "serious state interest" in it. *Ante,* at 294. But as American political scientists have known since James Madison pointed it out, see The Federalist No. 10, pp. 62–64 (H. Dawson ed. 1876), the dangers of

factionalism decrease as the political unit becomes larger. There is not much chance the State as a whole will be hamstrung by a multitude of so-called "parties," each of which represents the sectional interest of only one or a few districts; there is a real possibility that the Cook County Board will be stalemated by an equal division between "City Party" and "County Party" members. But the litigants here have not addressed whether the "complete slate" requirement is unconstitutional, and I decline to speculate. It must be assumed to be legitimate, in which case there is no basis for saying that 25,000 signatures for each district election (if that is less than 5% of the votes in the prior district election) cannot be demanded. The Court's holding that these cases are simply governed by *Socialist Workers Party* seems to me quite wrong. I respectfully dissent.