The Honorable Pam Adcock State Representative 6205 Hinkson Road Little Rock, AR 72209-4709
Dear Representative Adcock:
I am writing in response to your request for my expedited opinion on three questions I will paraphrase as follows:
 1. In light of the court's decision in Green Party of Arkansas v. Priest, 159 F.Supp.2d 1140 (E.D. Ark. 2001), do you agree with the attached opinion of the Secretary of State regarding the permissible time period during which one may gather signatures pursuant to A.C.A. § 7-7-205 in order to achieve recognized party status?
 2. Is the minimum-signature requirement for forming a new political party set forth at A.C.A. § 7-7-101 contrary to the ruling in Citizens to Establish a Reform Party v. Priest, 970 F.Supp. 690 (E.D. Ark. 1996)?
 3. Should a new party be able to qualify with a finite number of signatures (10,000), as recommended by the court in Citizens v. Priest?
RESPONSE
In my opinion, the answer to your first question is "no." See A.C.A. §7-7-205(a)(4). In this regard, I will note that the Secretary of State has informed the recipient of the opinion referenced in your request that he has changed his reading of the pertinent legislation. With respect to your second question, although the court did call into question the constitutionality of the minimum-signature requirement for forming a new party in the course of addressing the legality of entire election scheme, in the absence of any appellate ruling on this particular issue, I believe a reviewing court faced with a challenge to the current, amended election scheme would in all likelihood conduct a de novo review. See
Ark. Op. Att'y Gen. No. 99-255 (opining that in the wake of legislative election reforms, the statute should be presumed constitutional and should be tested only by the courts, if at all). With respect to your third question, I can do no more than set forth the standard whereby a reviewing court would test the constitutionality of any restrictions on access to the ballot.
Question 1: In light of the court's decision in Green Party of Arkansasv. Priest, 159 F.Supp.2d 1140 (E.D. Ark. 2001), do you agree with theattached opinion of the Secretary of State regarding the permissible timeperiod during which one may gather signatures pursuant to A.C.A. § 7-7-205in order to achieve recognized party status?
Respectfully, I disagree with the Secretary of State's opinion, which reads as follows:
 In your recent letter, you inquired about Section 7-7-205 of the Arkansas Code, which provides for a political group to achieve recognized party status by petition. You specifically state that it is your understanding that the current statute [provides] that a group may collect signatures within any 150 day period. You ask whether that is our understanding of the law.
 Please be advised that the Secretary of State will accept a petition that contains signatures obtained during any 150 consecutive days. However, please note that, in order to appear on a subsequent election ballot, the new party must submit its petition in time to meet the deadlines for candidate qualification and for the names of its candidates to be printed on the ballot.
Section 7-7-205 of the Arkansas Code (Supp. 2003), captioned "Political requirements for new political parties," provides in pertinent part:
 (a)(1) A group desiring to form a new political party shall do so by filing a petition with the Secretary of State.
 (2) The petition shall contain at the time of filing the signatures of qualified electors of this state equal in number to at least three percent (3%) of the total number of votes cast for the office of Governor or nominees for presidential electors, whichever is less, at the last preceding election.
* * *
 (4) The petitions shall be circulated during the period beginning one hundred fifty (150) days prior to the deadline for filing the petitions with the Secretary of State.
(Emphasis added.)
In my opinion, this statute is unambiguous in requiring that the collection of signatures by petition occur not in "any 150 day period," as the Secretary of State suggests, but rather in the 150-day period immediately preceding the deadline for filing. I am bolstered in this conclusion by the following finding of fact adopted by the United States District Court in Green Party of Arkansas v. Priest, 159 F.Supp.2d 1140,1142 (E.D. Ark. 2001):
 Under Section 7-7-205(a), a party seeking recognition cannot begin to circulate its petitions until 150 days before the . . . deadline. . . .
It is my understanding that the Secretary of State now agrees with my reading of the statute.
Question 2: Is the minimum-signature requirement for forming a newpolitical party set forth at A.C.A. § 7-7-101 contrary to the ruling inCitizens to Establish a Reform Party v. Priest, 970 F.Supp. 690 (E.D.Ark. 1996)?
In my opinion, the answer to this question is unclear, since the court at various points in its opinion suggested, on the one hand, that the minimum-signature requirement for forming a new party independently offended the First and Fourteenth Amendments to the U.S. Constitution and, on the other, that it did so only when considered in combination with various other since amended provisions of the election laws. Although the court might, if faced with the issue, declare the minimum-signature requirement unconstitutional even considered within the context of current election laws, I cannot with confidence opine that this conclusion is inevitable based solely upon the court's ruling inCitizens to Establish a Reform Party v. Priest, 970 F.Supp. 690 (E.D. Ark. 1996). Compare Ark. Op. Att'y Gen. No. 99-255 (opining that, in the wake of legislative reform designed to cure the other electoral defects addressed in Reform Party, the minimum-signature requirement should be presumed constitutional unless a reviewing court declares otherwise).[1]
In Reform Party, 970 F.Supp. at 692, the court offered as a finding of fact the following summary of the then pertinent statute:
 Pursuant to Ark. Code Ann. § 7-1-101(l)(A) a new political party may be officially recognized and qualified to participate in the next succeeding general election by filing with the Secretary of State a petition signed by qualified electors equal in number to at least 3% of the total vote cast for the office of Governor or nominees for presidential electors at the last-preceding election, and declaring their intention of organizing a political party.
Despite the contrary suggestion in your request, the applicable statute is currently not A.C.A. § 7-7-101 (Repl. 2000), which merely provides that no candidate shall appear on the ballot unless certified as a nominee pursuant to subchapter 7 of title 7, but rather A.C.A. §7-7-205(a)(2) (Supp. 2003),[2] which provides:
 The petition shall contain at the time of filing the signatures of qualified electors of this state equal in number to at least three percent (3%) of the total number of votes cast for the office of Governor or nominees for presidential electors, whichever is less, at the last preceding election.
In Reform Party, the court addressed the distinction between the statute just quoted and the following provision of A.C.A. § 7-7-103(b)(1)(B) (Supp. 2003), which applies to candidates seeking to run as independents:
 If the person is a candidate for state office or for United States Senator in which a statewide race is required, the person shall file petitions signed by not less than three percent (3%) of the qualified electors of the state or which contain ten thousand (10,000) signatures of qualified electors, whichever is the lesser.
The court offered the following comparison of these statutory provisions:
 With regard to filing a petition to have one's name placed on the ballot as an independent candidate without political party affiliation for state office or for which a statewide race is required, Ark. Code Ann. § 7-7-103(c)(2) requires such person to file with the Secretary of State a petition containing signatures of 3% of the qualified electors of the state, or 10,000 signatures of qualified electors, whichever is the lesser. No such alternative signature mechanism exists with regard to filing a petition for the organization of a new political party pursuant to Section 7-1-101.
970 F.Supp. at 693-94.
At issue in the court's opinion was, inter alia, whether the distinction between the number of petition signatures required to qualify as an independent candidate and the number required to form a new political party accords with constitutional principles. In Green Party of Arkansasv. Priest, 159 F.Supp.2d 1140, 1143-44 (E.D. Ark. 2001), the court summarized the applicable standard of review of such election laws and distinctions as follows:
 The United States Supreme Court in Anderson v. Celebrezze, 460 U.S. 780, 789, 75 L. Ed. 2d 547, 103 S. Ct. 1564 (1983), has adopted a special balancing test for evaluating claims against state election laws, all of which inevitably affect the fundamental rights of political parties, candidates and voters:
 [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.
Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of that scale, the law "imposes only `reasonable, nondiscriminatory restrictions' upon theFirst and Fourteenth Amendment rights of voters, the `State's important regulatory interests are generally sufficient to justify' the restrictions." Burdick v. Takushi, 504 U.S. 428, 434, 119 L. Ed. 2d 245,112 S. Ct. 2059 (1992) (quoting Anderson v. Celebrezze, 460 U.S. at 788,788-89 n. 9). But when the law places "severe" burdens on the rights of political parties, candidates or voters, "the regulation must be `narrowly drawn to advance a state interest of compelling importance.'" Id. at 434 (quoting Norman v. Reed, 502 U.S. 279, 289, 116 L. Ed. 2d 711,112 S. Ct. 698 (1992)).
Elaborating on this standard, the court in Reform Party observed:
 The Supreme Court recently emphasized that for more than two decades it has recognized "the constitutional right of citizens to create and develop new political parties." Norman v. Reed, 502 U.S. at 288, 112 S.Ct. at 705. Noting the constitutional interest advanced by like-minded citizens gathering in pursuit of the creation of a new political party, the Supreme Court clearly enunciated the appropriate standard of review as follows: "To the degree that a state would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation, [citation omitted] and we have accordingly required any severe restriction to be narrowly drawn to advance a state interest of compelling importance." Id. at 288-89, 112 S.Ct. at 705.
970 F.Supp. at 696 (brackets in original).
The court further remarked:
 The "flexible, sliding-scale test" requires this Court to weigh" the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interest put forward by the state as justifications for the burden imposed by its rule," taking into consideration" the extent to which those interests make it necessary to burden the plaintiffs' rights." Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992).
970 F.Supp. at 697.
In what appears to be a variant formulation of the Anderson test[3]
that nonetheless led to the same result, the court further offered the following:
 Application of the test in Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230
(1979) demonstrates that Ark. Code Ann. §§ 7-1-101(1) and 7-7-203(g) violate the Equal Protection Clause. In Illinois State Board, the court, in determining whether the Illinois elections law violated the Equal Protection Clause of the Fourteenth Amendment, looked at three elements: (1) the character of the classification; (2) the importance of the individual interests at stake; and (3) the state's asserted interests supporting the classification. 440 U.S. at 183, 99 S.Ct. at 989-90.
970 F.Supp. at 698.
In Ark. Op. Att'y Gen. No. 99-255, my predecessor considered the classification at issue in your request within the context of the entire statutory schemes applicable to the qualification of independent candidates, on the one hand, and the formation of new political parties, on the other. My predecessor did so based upon the following principle expressed by the court in Reform Party:
 When examining the entire statutory scheme, it is important to evaluate the combined effect of the statutory requirements. Republican Party of Ark. v. Faulkner, 49 F.3d 1289 (8th Cir. 1995).
970 F.Supp. at 699 (emphasis added).
Specifically, my predecessor opined that what rendered the petition process unconstitutional at the time the court issued its opinion inReform Party was not merely the disparity discussed above, but rather that disparity considered in conjunction with a variety of other statutory infirmities. This opinion would appear to draw support from the court's following conclusion:
 The combined effect of the early deadline in conjunction with the 3% requirement of Ark. Code Ann. § 7-1-101(1)(A) places an unreasonable burden of [sic] federally protected constitutional rights.
Id. (emphasis added). My predecessor summarized the court's analysis of this combined effect as follows:
 Important points in the court's analysis included the fact that the filing deadline for new political parties to file their signatures was, under former law, January 2. This deadline was held to be unconstitutionally early, in that it is difficult, this far in advance of the election, to garner interest in political activities. Id. at 698. The holiday season and inclement weather occurring around this deadline also played a role in the ruling. Id. at 698, 692. The court also found an unconstitutional distinction between requiring the 3% signature collection figure for new political parties, and requiring this same amount,[4] or, in the alternative, 10,000 signatures for a statewide independent candidacy. No such alternative lesser figure was afforded proponents of a new political party and the district court found this distinction unconstitutional. Id. at 698, 699. Also mentioned in the district court's findings of fact was the fact that new political parties were allowed no additional period to "cure" signatures found to be insufficient by the Secretary of State. Id. at 693. In addition, the court's findings of fact indicated that there were at the time no "statutory guidelines or requirements as to who, if anyone, must approve the petition, whether the petition must contain a circulator's verification under oath to the qualified elector status of each signatory . . . and the procedure to be followed by the Secretary of State in verifying the petition signatures." Finally, the court found the pertinent statutes "void for vagueness," in light of the fact that the statutes were unclear, did not clearly outline the conduct required, and gave public officials unreviewable discretion in enforcing the statute.
(Footnotes omitted; emphasis in original.)
My predecessor next observed that a number of the constitutional problems noted by the court had subsequently been cured by amending then A.C.A. §7-7-204, which is now A.C.A. § 7-7-205, see note 1, supra:
 [T]he filing deadline has been changed from January 2 to the first Monday in May. A.C.A. § 7-7-204 (a). A period is afforded to cure deficient signatures after submission. A.C.A. § 7-7-204 (e). An oath and verification is now required. A.C.A. § 7-7-204(c). The procedure for the Secretary of State's certification is outlined. A.C.A. § 7-7-204. The vagueness concerns, and the" unreviewable discretion," have been lessened. A.C.A. § 7-7-204(a) (c), (d), (e), (g) and (h).
In the wake of these statutory amendments, my predecessor offered the following analysis of the percentage-requirement issue:
 Although the court in Citizens to Establish a Reform Party found this same percentage requirement constitutionally objectionable, the court's decision was not based upon this requirement in isolation, but, rather, was based upon a number of factors arising from the then statutory scheme. The relevant statutory scheme has, since the issuance of the court's decision, been liberalized as regards the filing deadline, and in other respects important to the court's decision.
My predecessor concluded that "the statutory scheme is presumed constitutional and sets the signature requirement in the absence of a judicial ruling to the contrary."
I agree with my predecessor that the court in Reform Party considered "a number of factors" in evaluating the constitutionality of the procedure then in effect for qualifying to appear on the ballot. However, I believe a question remains whether the court's conclusion regarding the constitutionality of the signature requirement applicable to establish a new party "was not based upon this requirement in isolation." The court analyzed this requirement as follows:
 First, the Arkansas Legislature has arbitrarily chosen to apply both the same standard and a different standard for proponents who advance independent candidates in contrast to proponents who advance a new political party. On the one hand, both can demonstrate a satisfactory showing of support with a 3% signature requirement.[5] On the other hand, an independent candidate for statewide office may, in the alternative, meet the requirement with 10,000 signatures. Such an arbitrary classification makes it unreasonably difficult for proponents to advance new political parties while allowing independent candidates to be placed on the ballot with even less public support. Second, as discussed previously, ballot access and voters' interests in the political process constitute fundamental rights which this Court must review with the strictness of scrutiny [sic]. Third, the State cannot advance any compelling interest or rational basis supporting this discriminatory and arbitrary classification.
* * *
 [I]f 10,000 signatures are sufficient to demonstrate a modicum of support for an independent candidate (Ark. Code Ann. § 7-7-103(c)(2)), then 10,000 signatures are also sufficient to demonstrate a modicum of support for a new political party, especially where the legislature has also established that a sufficient demonstration of a modicum of support is established in both instances by a 3% signature requirement. Proponents of a new political party in Arkansas must be afforded the corresponding opportunity to submit a finite number of signatures as an alternative to a percentage fixed by statute. Moreover, the finite number of signatures that should be allowed for the creation of a new political party should be the same as the finite number alternative established by the Arkansas Legislature for an independent candidate, given the common fundamental rights involved in both instances.
970 F.Supp. at 698-99.
The court concluded:
 The Arkansas Legislature's unequal treatment of the procedures required for demonstration of support of a new political party and corresponding provision for an independent candidate constitute a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Secretary of State Priest is, therefore, enjoined from enforcing Ark. Code Ann. §§ 7-1-101(1) and 7-7-203(g), and Plaintiffs are deemed to have qualified as a new political party in view of the 17,262 signatures validated by Secretary of State Priest on February 16, 1996.
Id. at 699.
The court further declared:
 The individual statutory provisions . . . as well as the combined effect of the statutes place unreasonable burdens on Plaintiffs, and those burdens are sufficiently severe to violate Plaintiffs' rights under First Amendment guarantees of freedom of speech and freedom of association and Fourteenth Amendment guarantee[s] of equal protection and the right to due process.
Id. at 696. Echoing this conclusion, the court further declared: "The Arkansas statutes at issue here, individually and in combination, place unreasonable burdens on Plaintiffs' ability to obtain ballot access."Id. (emphasis added). The court again made this point in declaring:
 A review of Arkansas' election code demonstrates that the statutes individually and in combination place unreasonable and burdensome obstacles in the path of new political parties seeking ballot access.
Id. at 697.
In a ruling issued after my predecessor issued his opinion, the same federal district judge summarized his previous ruling as follows:
 [T]he United States District Court for the Eastern District of Arkansas held in Citizens to Establish a Reform Party v. Priest, 970 F.Supp. 690, 699 (E.D. Ark. 1996), that the Equal Protection Clause of the Fourteenth Amendment requires that the number of signatures required of new parties seeking recognition be the same as the number (10,000) required of independent candidates seeking ballot access under Section 7-7-103(c)(2) of the Arkansas Code.
Green Party, 159 F.Supp.2d at 1142. Although this declaration is clearly dictum within the context of the Green Party opinion, which addressed the propriety of foreclosing a newly formed party from participating in a special election in an odd-numbered year, the court's declaration would appear to suggest that even after the legislative reforms discussed in my predecessor's opinion, the court continued to consider unconstitutional the disparity in the requirements for independent candidates and political parties to qualify for the ballot.
However, the fact remains that the court in Reform Party felt obliged to stress in certain parts of its opinion that its conclusions turned on a consideration of the combined procedural requirements to form a new party. The court may have felt the need to do so based upon the following footnote from Faulkner County, which is the case the district court invoked in support of its combination analysis:
 We note that the Supreme Court has clearly endorsed and arguably required the practice of holding election laws unconstitutional in combination without considering the constitutionality of particular provisions in isolation. For example, in Williams,[6] 393 U.S. at 34, 89 S.Ct. at 12, the Supreme Court held that "the totality of the Ohio restrictive laws taken as a whole imposes a burden on the voting and associational rights which we hold is an invidious discrimination, in violation of the Equal Protection Clause."
49 F.3d at 1300 n. 6 (emphasis added). The court in Faulkner County
exercised such combinational analysis in offering the following:
 While it may be true that, by itself, the requirement that a party hold a primary election to select its nominees is necessary to meet the state's interest in ensuring that the majority's will is reflected in the winner of the election process, see Storer,[7] 415 U.S. at 735, 94 S.Ct. at 1281-82, the state's interest does not necessitate the additional requirement that parties pay for, as well as conduct, primary elections. In combination, Arkansas's dual requirements cannot be justified as necessary to protect the public from frivolous candidates or to ensure that the eventual victors enjoy the majority's support.
Id. at 1300.
The operative principle in this analysis appears to be that election laws that might pass constitutional muster if considered in isolation might nevertheless fail to do so when considered in conjunction with other election laws. See Storer, 415 U.S. at 737 ("The concept of `totality' is applicable only in the sense that a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights."). I read the Supreme Court's pronouncement inStorer as establishing only that a court could not affirm an election statute as constitutional without considering its effects in conjunction with other election statutes. I believe the court's pronouncements inFaulkner must be read in light of this limitation, meaning that the proscription against "considering the constitutionality of particular provisions in isolation," 49 F.3d at 1300 n. 6, would not preclude a court from simply declaring a single statute unconstitutional, but rather would preclude it from ending the inquiry upon a mere finding that the statute standing alone was facially valid. Storer, 415 U.S. at 737. Upon such a finding, the question would remain whether the net effect of the current election statutes would render that statute unconstitutional.
In Opinion No. 99-255, my predecessor concluded that a court faced with a challenge to the signature requirements would undertake a de novo review of these requirements in light of the entire election scheme as amended since the issuance of the Reform Party decision. Given the numerous amendments to election laws since the issuance of Reform Party, including an apparently nonsubstantive amendment to the law imposing the signature requirements, I am not inclined to second-guess this opinion. In my opinion, a court faced with a new challenge to the signature requirements might further be influenced in its approach by the fact that the court inReform Party appears to have overlooked the crucial difference in the 3% signature requirements applicable to independent candidates and those seeking to form new parties. Acknowledging this difference may lead to a divergent conclusion regarding whether the categories of independent candidates and those seeking to form new parties are subject to constitutionally significant disparate treatment with respect to ballot access. A court faced with the issue in the wake of a challenge brought by individuals who were not party to the Reform Party action may well be inclined to test anew the proposition that independent candidates and those promoting the formation of new political parties are indeed indistinguishable for purposes of determining what restrictions on access to the ballot might apply. In this regard, irrespective of how one might read Reform Party and Green Party, I should note that both cases are lower federal-court rulings that have not been subjected to appellate review and that opine on the constitutionality of a state law that has not been subjected to review by the state's highest court. Until an appellate court rules on the question, it is quite possible that another trial court might read the statutes at issue differently. In the absence of controlling precedent, nothing precludes even district courts located within the same district from drawing different conclusions on a particular issue. See Herman MacLean v. Huddleston, 459 U.S. 275, 386
n. 21 (1983) (noting such a dispute between courts in the Eastern District of Pennsylvania).
To summarize, in light of (1) the circuit court's insistence on combinational analysis in Faulkner County, (2) my predecessor's application of combinational analysis in support of his conclusion that A.C.A. § 7-7-205(a)(2) is presumptively constitutional and would be independently reviewed by a court if challenged, and (3) the legislature's apparent conviction that the constitution does not preclude imposing disparate signature requirements for independent candidates and those seeking to form a new party,[8] I am not prepared to opine categorically that under current circumstances the statute conflicts with the court's ruling in Reform Party. As my predecessor rightly pointed out, judicial review in light of current circumstances appears the appropriate course to follow.
Question 3: Should a new party be able to qualify with a finite number ofsignatures (10,000), as recommended by the court in Citizens v. Priest?
I can do no more than note that the court in Green Party characterized its holding in Citizens to Establish a Reform Party v. Priest as being that the equal protection clause mandates that if an independent candidate can qualify for the ballot upon producing 10,000 signatures in support of his candidacy, a new party should be able to field candidates upon producing the same number of signatures in support of its formation.159 F.Supp.2d at 1142. I am not prepared to opine either that the 10,000 figure has some constitutionally talismanic significance or that the Arkansas Supreme Court would invalidate A.C.A. § 7-7-205(a)(2), which sets the signature requirement for the formation of a new party, simply because that signature requirement might be considered more onerous than the requirement set forth at A.C.A. § 7-7-103(b)(1)(B), which sets the signature requirement for an independent candidate to be listed on the ballot. For the reasons stated in my response to your previous question, in the absence of guidance from an appellate court, I am unable to render an opinion on this question. I can only point out that whatever election scheme the legislature adopts, a reviewing court will test its constitutionality by applying the strict standard discussed above.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB/JHD:cyh
[1] As my predecessor pointed out, legislation is presumed constitutional unless judicially declared otherwise. See Ford v. Keith,338 Ark. 487, 996 S.W.2d 20 (1999); ACW, Inc. v. Weiss, 329 Ark. 302,947 S.W.2d 770 (1997).
[2] Act 886 of 1997, § 4, which restated the 3% minimum-signature requirement at issue in Reform Party in 1996, enacted as A.C.A. § 7-7-204
what is now codified as A.C.A. § 7-7-205. Act 343 of 1997, § 1 had already denominated as A.C.A. § 7-7-204 the statute currently codified under that section reference. In order to rectify matters, the Code Revision Commission redesignated as A.C.A. § 7-7-205 the statute enacted as A.C.A. § 7-7-204 pursuant to Act 886 of 1997, § 4. Although such a redesignation would appear to be clearly within the Commission's purview, see A.C.A. § 1-2-303(d)(1)(G) (Supp. 2003) (authorizing the Commission to ("[n]umber, renumber, redesignate and rearrange chapters, subchapters, sections subsections and subdivisions, or any combination or portion thereof"), the redesignation apparently did not occur until 2000, before which the Code contained two §§ 7-7-204.
[3] In Republican Party of Ark. v. Faulkner, 49 F.3d 1289 (8th Cir. 1995), the court extensively reviewed a variety of standards that the Supreme Court has advanced in the course of addressing election-law challenges.
[4] My predecessor was correct in characterizing the court as having read the applicable statutes as imposing an identical 3% signature requirement as one alternative to show sufficient public support for access to the ballot of either an independent candidate, on the one hand, or a newly formed political party, on the other. Specifically, the court observed that "a sufficient demonstration of a modicum of support is established in both instances by a 3% signature requirement."970 F.Supp. at 698. However, the court's suggestion that an identical "3% signature requirement" applies to afford ballot access to both an independent candidate and a new political party is misleading. Section7-7-205(a)(2) of the Code provides that one might establish a new political party by filing a petition containing "the signatures of qualified electors of this state equal in number to at least three percent (3%) of the total number of votes cast for the office of Governoror nominees for presidential electors, whichever is less, at the last preceding election." (Emphasis added.) By contrast, A.C.A. §7-7-103(b)(1)(B) provides that a candidate running for statewide or federal office as an independent may qualify by filing a petition "signed by not less than three percent (3%) of the qualified electors of thestate or which contain ten thousand (10,000) signatures of qualified electors, whichever is the lesser." (Emphasis added.) As reflected in the highlighted language, the 3% requirement applicable to these two classifications is not identical.
[5] See footnote 3, supra.
[6] Williams v. Rhodes, 393 U.S. 23 (1968).
[7] Storer v. Brown, 415 U.S. 724 (1974).
[8] As the court noted in Mears, County Judge v. Hall, 263 Ark. 827,835, 569 S.W.2d 91 (1978):
 Legislative interpretation of constitutional provisions is never binding on the courts, but, if there is any doubt or ambiguity, it is persuasive and entitled to some consideration. Griffin v. Rhoton, 85 Ark. 89, 107 S.W. 380.