**Henry HEWES, Plaintiff,**

v.

**Robert ABRAMS, Attorney General of the State of New York, New York City Board of Elections, New York State Board of Elections, Does 1 Through 100, Defendants.**

**No. 89 Civ. 2679 (CSH).**

United States District Court, S.D. New York.

May 5, 1989.

Henry Hewes, New York City, pro se.

Robert Abrams, Atty. Gen., New York City (Dennis Saffran, Asst. Atty. Gen., of counsel), pro se.

Peter Zimroth, Corp. Counsel, New York City (Tai Park, Asst. Corp. Counsel, of counsel), for defendants.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This action is now before the Court on plaintiff's motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) and defendants' cross-motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).

## Facts

Plaintiff, who seeks the New York City mayoral nominations of both the Republican and Right to Life parties in the current election, challenges the constitutionality of that provision of the state's election law governing access to the primary ballots. Election Law § 6–136(2).

The challenged provision reads as follows:

> 2. All other petitions [i.e., petitions for nonstate wide office] must be signed by not less than five per centum, as determined by the preceding enrollment, of the then enrolled voters of the party residing within the political unit in which the office or position is to be voted for, provided, however, that for the following public offices the number of signatures need not exceed the following limits: ...

Subsection 2 of the Election Law provides an alternative to the 5% signature requirement in the form of a cap on the number of signatures required. The alternative signature requirement varies with the office being sought. In order to qualify for the mayoral primary a candidate must present a petition signed by either 5% of the persons registered in his party, or by 10,000 persons, whichever is fewer. Election Law § 6–136(2)(a). Plaintiff complains of the workings of the Election Law in the context of his quest for citywide office, and challenges the constitutionality of § 6–136(2)(a).

Plaintiff contends that § 6–136(2)(a) violates the equal protection clause in that the signature cap results in a disparity between parties in respect of the percentage of the registered party voters necessary to place a candidate's name on the primary ballot. The statistical disparity plaintiff complains of results from the differing party sizes within New York City. Hewes states that there are approximately 2,128,-000 enrolled Democrats; 415,000 enrolled Republicans; and 6,000 enrolled members of the Right–To–Life Party in New York City. Declaration of Henry Hewes dated April 20, 1989 at p. 2.

Under the state election law a person seeking to qualify for the democratic mayoral primary must obtain the signatures of 5% of the registered voters, 106,400 signatures, or 10,000 signatures, whichever is less. A Republican seeking the mayoral nomination needs the signatures of 20,750 members of his party, that number being equal to 5% of the 415,000 registered Republicans in New York City. In the alternative, the Republican candidate can access the primary ballot by presenting a petition signed by 10,000 registered New York City Republicans. Clearly, in both the Republican and Democratic parties, the alternative of obtaining 10,000 signatures is less burdensome than obtaining a petition signed by 5% of the registered voters in those parties. However, 10,000 signatures represents 2.4% of registered Republican voters in New York City, while the same number of signatures represents only 0.5% of voters registered as Democrats.

The situation for a candidate seeking to access the primary ballot of the Right–To–Life party presents a situation mathematically different from that of a Republican or Democratic candidate, in that 5% of registered voters in the Right–To–Life party is a significantly lower number than the alternative 10,000 signature requirement. Three hundred signatures, which is 5% of the approximately 6,000 persons registered as members of the Right–To–Life party, are all that is required to access the mayoral primary in that party.

As discussed *supra*, the maximum signature requirement works a statistical disparity between parties in respect of the percentage of registered voters needed to access the party primary in the mayoral race. It is this statistical disparity that forms the basis for plaintiff's equal protection claim. In essence, plaintiff contends that the maximum signature requirement works a disadvantage on members of minority parties, in that it makes it more difficult for those candidates to access their party's primary. Plaintiff contends that the direct result of the maximum signature requirement is "that voters in the City of New York are systematically deprived of the full exercise of choice in the election process ... and [he

is] unduly burdened in [his] attempt to seek the office of mayor." *Id.* at p. 4.

Plaintiff asks that the challenged provision of the New York State Election Law be struck down as violative of the equal protection clause and further that the New York City Board of Elections be enjoined from enforcing the provision. Alternatively, plaintiff asks that this Court order the New York City Board of Elections to abide by the primary ballot access scheme which he has devised.[1] Plaintiff's motion for injunctive relief, brought by Order to Show Cause, and defendants' cross-motion to dismiss were fully argued on May 1, 1989.

## Discussion

I deal first with the point raised in defendants' opposing papers concerning the propriety of naming the Attorney General of the State of New York and the New York State Board of Elections as parties defendant. The attorney general takes the position that both the board and the attorney general should be removed as parties defendant, after which the attorney general should be permitted to intervene in defense of the constitutionality of the challenged statute. 28 U.S.C. § 2403(b); New York Executive Law § 71. At oral argument, plaintiff consented to the dropping of the New York State Board of Elections and the attorney general as parties defendant in favor of allowing the attorney general to intervene in defense of the statute's constitutionality. Tr. at 2.[2] Therefore, I grant the application of the attorney general.

Plaintiff moves for injunctive relief. It is well settled that "[t]his is an extraordi-

nary and drastic remedy which should not be routinely granted." *Medical Soc'y of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977) (*citing Pride v. Community School Board,* 482 F.2d 257, 264 (2d Cir.1973); *Dopp v. Franklin National Bank,* 461 F.2d 873, 878 (2d Cir.1972)).

The standard in the usual case for determining whether a preliminary injunction should issue is familiar. The party seeking injunctive relief must show

"(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Sadowsky v. City of New York,* 732 F.2d 312, 316 (2d Cir.1984) (*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). However, the Second Circuit has also said that where "the grant of interim relief *may* adversely affect the public interest in a manner which cannot be compensated for by an injunction bond, plaintiffs undertake an even greater burden of persuasion." *Toia, supra,* at 538 (emphasis added). Indeed, "it is not too much to ask that plaintiffs who seek such interim relief establish a probability of success on the merits." *Id.*

In the case at bar, plaintiff seeks to enjoin the operation of those provisions of the state election law governing access to the primary ballot in non-state wide elections. If injunctive relief were to enter, it would necessitate a substantial reworking of the electoral laws. The public interest

---

**1.** Plaintiff proposes a system of access to the primary ballot that would set the number of required signatures at a standardized percentage of persons registered in the relevant party. Plaintiff's system provides that the percentage be calculated by determining the percentage of persons enrolled in each party required for ballot access based on a universal signature requirement equal to the cap for the election at issue. The smallest percentage would then be applied to all parties to determine the actual number of signatures required to access the primary ballot.

For instance, as discussed in text *supra,* 10,-000 signatures represents 2.4% of the registered Republicans and 0.5% of the registered Demo-

crats in New York City. The 10,000 signature requirement cannot effectively be applied to the Right–To–Life party which has a total membership of only 6,000 persons. Thus, assuming the existence of only these three parties, 0.5% of the registered voters represents the lowest percentage and as applied to the remaining parties would require a Republican mayoral candidate to obtain 2,075 valid signatures from members of his party and a Right–To–Life candidate to obtain 30 signatures from members of his party to achieve ballot access.

**2.** "Tr." refers to the transcript of the argument held on May 1, 1989.

in the running of orderly elections clearly "may be adversely affected" by the relief requested, and could not be protected by the mere posting of an injunction bond. This case is thus on par with *Toia* where the court, faced with the review of a district court ruling which preliminarily enjoined the implementation of certain provisions of the New York Social Services Law, vacated the grant of injunctive relief finding no showing of probability of success on the merits. In order to succeed on his application for injunctive relief, plaintiff must establish a likelihood of success on the merits.

Plaintiff, who is attacking the constitutionality of a duly enacted state statute, bears the burden of establishing its unconstitutionality. *McGee v. Board of Elections of City of New York,* 669 F.Supp. 73, 76 (S.D.N.Y.1987) (Weinfeld, J.) (*citing Metropolitan Casualty Ins. Co. v. Brownell,* 294 U.S. 580, 584–86, 55 S.Ct. 538, 540–41, 79 L.Ed. 1070 (1935)). Where, as here, the plaintiff has not shown "invidious discrimination based upon wealth or race classifications or a preclusion of the right to vote, heightened scrutiny is not required." *McGee, supra,* at 77 (*citing McDonald v. Board of Election,* 394 U.S. 802, 807, 89 S.Ct. 1404, 1407, 22 L.Ed.2d 739 (1969); *Unity Party v. Wallace,* 707 F.2d 59, 63 (2d Cir.1983)). Instead, "[t]he challenged restriction is subject only to a rational basis analysis." *Unity Party, supra,* at 63.

It is well recognized that " 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983) (*quoting Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). The Court has further stated that

> [t]o achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

*Anderson, supra,* 460 U.S. at 788, 103 S.Ct. at 1570 (footnote omitted).

I turn now to whether there is a rational basis for the ballot access provisions contained in Election Law § 6–136(2). The Supreme Court has recognized that ballot access may be conditioned "upon a showing of a modicum of support among the potential voters for the office." *Munro v. Socialist Workers Party,* 479 U.S. 189, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986). This requirement of "some preliminary showing of a significant modicum of support" furthers that interest which the Court has classified as "important", not merely rational, "in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).

The Court has further stated that a State is not required to "make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro, supra,* 107 S.Ct. at 537.

> To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not signifi-

cantly impinge on constitutionally-protected rights.

*Id.* at 538.

In examining that provision of the Election Law at issue in the instant case, it is clear that the legislature engaged in a legitimate balancing of important competing interests, namely the interest in ballot control as weighed against the interest in ballot accessibility from the point of view of a candidate. The interest in ballot control, one recognized by the Supreme Court, is furthered by the requirement that candidates evidence a certain "modicum of support" before their name will be placed on the primary ballot. The Court has found that a signature requirement of 1% of the entire electorate, not merely of one's own party, is a valid means of ballot control. *Munro, supra.* Further, a signature requirement equal to 5% of one's own party is also valid. *Jenness, supra.*

Although under *Jenness* a standardized 5% signature requirement would be constitutional, the New York legislature elected to cap that requirement in order not to place too severe a burden on access to the primary ballot. In a large party, such as the Democratic party, 5% of the registered voters amounts to 106,400 signatures, clearly more than is required to evidence that modicum of support which furthers the state's important interest in ballot control. Moreover, to require in excess of 100,000 signatures in order to access the primary ballot would clearly be a daunting task and might well discourage participation in the political process by some would-be candidates. A signature cap is thus a rational accommodation of these varying interests. Indeed, courts have recognized that varying the size of signature requirements based on the size of the relevant voter base is rational and thus perfectly consistent with the equal protection clause. *See Mahon v. Abrams,* 88 Civ. 1745 (S.D.N.Y. March 21, 1988) (LBS), *aff'd,* 847 F.2d 835 (2d Cir.1988) (prelimi-

nary injunction denied on plaintiffs' equal protection claim in respect of provision of § 6–136(2) requiring signatures of 5% of party enrolled in a given district or 1,250 signatures, whichever is less, in order to name delegates to the Republican party convention); *Meyerson v. Board of Elections,* 87 Civ. 6168 (S.D.N.Y. September 3, 1987) (PKL) and *McGee, supra* (rejecting equal protection challenges to provisions of § 6–136(2) setting forth disparate signature ceilings for county-wide offices in different counties).

The legislative compromise embraced by § 6–136(2), clearly a rational one furthering the state's interest in ballot control, does not "significantly impinge on constitutionally-protected rights", *Munro, supra,* 107 S.Ct. at 538, as the Court has analyzed state voting laws. The signature caps at issue in the instant challenge serve to "liberalize ballot access in heavily populated [parties]", *Mahon,* slip op. at 11, and certainly cannot be said to impinge on the rights of members of minority parties any more significantly than in the statutory scheme upheld by the Court in *Jenness.* In that case the Court upheld against equal protection challenge a Georgia law that imposed no signature requirement whatsoever upon candidates running as members of established "political parties", but imposed a 5% signature requirement for members of "political bodies".[3] Thus, the statute upheld as against equal protection challenge in *Jenness* created a statistical disparity much greater than that resulting under the instant scheme, in that under the Georgia statute no signature requirement exists for established parties while smaller parties, even those achieving as much as 19% of the vote in the last gubernatorial election, are required to meet a 5% signature requirement.

Under precedent such as *Jenness* it is clear not only that plaintiff is not entitled to the injunctive relief sought, but that his

---

3. The Georgia statute defines a "political party" as any political organization whose candidate received at least 20% of the vote at the most recent gubernatorial election. *Jenness, supra,* 403 U.S. at 433, 91 S.Ct. at 1971. Any political organization whose candidate received any portion of a percentage less than the 20% threshold is deemed a "political body" for purposes of the statute. *Id.*

petition fails to state a cause of action and must therefore be dismissed pursuant to Rule 12(b)(6).

### *Conclusion*

The motion of the New York State Board of Elections and the Attorney General of the State of New York to be dropped as parties defendant is granted. The application of the attorney general to intervene in defense of the constitutionality of the challenged statute is granted.

Plaintiff's motion for a preliminary injunction is denied. The cross-motion to dismiss the complaint is granted.

The Clerk is directed to dismiss the captioned action with prejudice and without costs.

The foregoing is SO ORDERED.