MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT

JANE W. FREEMAN, Judge.
The Defendants, the Mohegan Tribe Election Committee (“Committee”) and the Mohegan Tribe of Indians of Connecticut (“Tribe”) have moved for summary judgment on the Plaintiffs Complaint. The operative Complaint is the Amended Complaint dated January 15, 2009. The Plaintiff contends that the Tribe’s ban on bullet voting in the Election Code, MTC § 1-201, et seq., violates several provision of the Mohegan Constitution. The ban on bullet voting is contained in Section 1-205(a) and Section l-206(e)(2) of the Election Code.
Every registered voting member of the Tribe who submits a ballot in a Tribal election shall be required to cast one (1) vote thereon for each elective position available.
MTC § l-205(a).
(e) No spoiled ballot shall be counted. For purposes of this Article, “spoiled” shall mean any of the following: ...
(2) The ballot contains more votes than positions available, or contains less votes than positions available in violation of Section l-205(a) of this Article....
MTC § l-206(e). Bullet voting (also known as “single-shot” voting) is a tactic where the voter selects one or a limited number of candidates, despite having the option to indicate a preference for other candidates. This technique “enables a minority group to win some at-lai'ge seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of *124 candidates.” Thornburg v. Gingles, 478 U.S. 30, 38, n. 5, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (citations omitted).
The Plaintiff has requested a declaratory judgment that the Committee’s decision declaring his ballots spoiled in two Tribal elections violated: (1) his voting rights under Article VII, Section 2 of the Mohegan Constitution[1]; (2) his free speech rights under the Indian Civil Rights Act (“ICRA”), 25 U.S.C. § 1302 and Article XI, Section 1(a) of the Mohegan Constitution; (3) his equal protections rights under IGRA and Article XI, Section 1(h) of the Mohegan Constitution[2]; and (4) the procedures for constitutional amendment in Article VII of the Constitution. He also seeks to enjoin the Defendants from conducting future elections under the provisions in Section 1-206 of the Election Code.
The Defendants have moved for summary judgment claiming that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law because: (1) the ban on bullet voting protects the legitimate governmental interests of ensuring tribal cohesiveness and avoiding unrestrained factionalism along family lines, so that the Plaintiffs free speech claim has no merit; (2) the same legitimate governmental interests bar the Plaintiffs equal protection claim; (3) there is no conflict between Article VII, Section 2 of the Mohegan Constitution and the challenged provisions of the Election Code; and (4) the presence of procedures in the Mohegan Constitution for its amendment, provide no basis for declaring a provision of the Election Code invalid.
I. FACTS
The Defendants have established the following undisputed and relevant facts from the pleadings, affidavits and exhibits: ever since the Mohegan Tribe created a constitutional form of government in 1978, it has been a Mohegan tribal election custom to prohibit voters from voting for fewer candidates than the number of open positions. Zobel Affidavit, ¶ 3. Melissa Tantaquid-geon Zobel is the Tribal Historian and prepared or participated in preparing the document attached to her affidavit entitled “Tribal Election Custom” in which she described the election customs of the Tribe. Zobel Affidavit, ¶¶ 1, 3. Jayne Grandchamp Fawcett was a member of the Mohegan Tribal Council in the 1970s and from 1987 to 2005. Fawcett Affidavit, ¶ 1. Loretta Roberge was a member of the Mohegan Tribal Council from the late 1960s through the late 1980s and then from 1995 to 2000. Roberge Affidavit, ¶ 1. After the Tribe’s federal recognition in 1994, members of the Tribal Council were concerned that bullet voting would adversely affect the cohesiveness of the Tribe and that tribal members would vote only for members of their own families rather than across family lines. Fawcett Affidavit, ¶ 3. They supported a continued prohibition on bullet voting because they believed it would dis *125 courage tribal members from voting only along family lines. Fawcett Affidavit, ¶ 3; Roberge Affidavit, ¶ 2.
In the first election ordinance adopted in 1995[3], and in subsequent amendments and revisions thereto, including Section 1-206(e)(2) of the Election Code, the Tribe has prohibited the counting of ballots cast by those tribal members who voted for greater or fewer than the number of positions to be filled. Johnson Affidavit, ¶ 2. The purpose of such provision was to discourage tribal members from voting only along family lines. Fawcett Affidavit, f 3. By prohibiting bullet voting in its election ordinances, the Tribe has continued to encourage cross-family voting.
The Plaintiff voted in run-off tribal elections in August of 2007 and in August of 2008, but because he voted for only three candidates when four positions were available in each election (Amended Complaint f 2), the Committee deemed his ballots “spoiled” and did not count them in either election (Amended Complaint ¶ 2).
II. APPLICABLE LAW
A. Summary Judgment Standards
The Gaming Disputes Rules of Civil Procedure are currently applicable to actions in the Mohegan Tribal Court. Moh. R.P. § lA(c).[4] Section 49 of the Gaming Disputes Rules of Civil Procedure provides the procedures for summary judgment:
b. Proceedings on Motion. A motion for summary judgment shall be supported by such documents as may be appropriate including affidavits, depositions, disclosures, written admission and like documents which show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The adverse party shall file opposing affidavits or other documentary evidence as provided in this rule within the time set forth in § lod, setting forth specific facts showing that there is a material issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party,
c. Form of Affidavits. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein. Swrorn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto....
f. Judgment. Judgment shall be rendered forthwith if the pleadings and any other proof show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
“Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of lawr.” Leo Gold v. East Haddam, 290 Conn. 668, 677, 966 A.2d 684 (2009). In addition,
[ajlthough the party seeking summary judgment has the burden of showing the nonexistence of any material fact ... a party opposing summary judgment must substantiate its adverse claim by show *126 ing that there is a genuine issue oí material fact together with the evidence disclosing the existence of such an issue .... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court....
Id. at 677-78, 966 A.2d 684.
Evidence sufficient to support summary judgment “is not rebutted by the bald statement that an issue of fact does not exist ... To oppose a motion for summary judgment successfully, the nonmov-ant must recite specific facts ... which contradict those stated in the movant’s affidavits and documents.” Hammer v. Lumberman’s Mut. Cas. Co., 214 Conn. 573, 579, 573 A.2d 699 (1990) (citations omitted).
In response to the affidavits of Zo-bel, Fawcett, Roberge and Johnson filed by the Defendants, the Plaintiff filed eleven affidavits from tribal members. Ten of these tribal members state that they would consider voting for qualified candidates who are not their close relatives, if they could freely choose who to vote for in tribal elections. However, the Plaintiffs affidavits do not create any genuine issues of material fact. The key issue is not whether tribal members would or would not vote along family lines if there were no prohibition on bullet voting but whether the Tribal Council’s prohibition on bullet voting protects the legitimate governmental objective of ensuring tribal cohesiveness. See infra, pp. 7, 10-11. The Plaintiff has failed to present any evidence in his affidavits or other documents to contradict the affidavits filed by the Defendants, which establish that the Tribe has continued to include a prohibition on bullet voting in its election ordinances in order to ensure tribal cohesiveness, avoid unrestrained factionalism along family lines and encourage cross-family voting.
B. The Defendants Are Entitled to Summary Judgment As A Matter of Law
1. The Plaintiff’s free speech claim has no merit where the prohibition on bullet voting protects the Tribe’s legitimate governmental interest of ensuring tribal cohesiveness and preventing unrestrained factionalism along family lines.
The Plaintiff challenges the constitutionality of Section l-205(a) and Section 1—206(e)(2) of the Election Code. He contends that these provisions require him to vote for a pre-determined number of candidates in order to have his ballot counted regardless of his preference for these candidates and therefore violate his voting rights under Article VII, Section 2 of the Mohegan Constitution and his free speech rights under the Indian Civil Rights Act (“ICRA”), 25 U.S.C. § 1302 and Article XI, Section 1(a) of the Mohegan Constitution. He further argues that in evaluating his voting rights and free speech claims, the Court should apply a strict scrutiny standard of review because the challenged provisions of the Election Ordinance place a severe burden on his right to vote. The Defendants contend, however, that the challenged tribal election laws impose only reasonable, nondiscriminatory restrictions on the Plaintiffs free speech rights and do not impose a severe burden on those rights. “While the First Amendment is inapplicable in tribal courts, cases arising thereunder are applicable to the free speech and free press clauses of the Mohegan Constitution and ICRA.” Bauer v. Mohegan Council of Elders, 1 M.T.C.R 89, 90 (2009).
*127 The United States Supreme Court has consistently judged free speech claims in the context of the right to vote, in accordance with the following standards:
When deciding whether a state election law violates First and Fourteenth Amendment associational rights, [we] weigh the “ ‘character and magnitude’ ” of the burden the State’s rule imposes on those rights against the interests the State contends justify that burden and consider the extent to which the State’s concerns make the burden necessary. [Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063-64, 119 L.Ed.2d 245 (1996) ] (quoting Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983)). Regulations imposing severe burdens on plaintiffs’ rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State’s ‘“important regulatory interests’ ” will usually be enough to justify “ ‘reasonable, non-diseriminatory restrictions.’ ” Burdick, supra, at 434, 112 S.Ct. at 2063 (quoting Anderson, supra, at 788, 103 S.Ct. at 1569-1570); [Norman v. Reed, 502 U.S. 279, 288-89, 112 S.Ct. 698, 704-05, 116 L.Ed.2d 711 (1986)] (requiring “corresponding interest sufficiently weighty to justify the limitation”). No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. [Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) ] (“[N]o litmus-paper test ... separates] those restrictions that are valid from those that are invidious.... The rule is not self-executing and is no substitute for the hard judgments that must be made”).
Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358-59, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). Therefore, the threshold question in evaluating the Plaintiffs free speech claim is whether the burden placed on the Plaintiffs voting rights is severe, so that strict scrutiny review is required as the Plaintiff claims, or whether the Defendants need only show that the Tribe’s important regulatory interests are sufficient to justify the restrictions on the Plaintiffs voting rights.
The Court finds that the restrictions imposed on the Plaintiffs free speech rights are not severe. In Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Supreme Court upheld Hawaii’s blanket prohibition against write-in voting against a voter’s challenge that this blanket ban violated his rights to free expression and free political association under the First and Fourteenth Amendments. The voter argued, like the Plaintiff in this case, that he was deprived of the right to cast a meaningful ballot because the write-in ballot prohibition conditioned his electoral participation upon -waiving his First Amendment right to remain free from espousing positions that he did not support and discriminated against him based upon the content of the message he sought to convey through his vote. The Court rejected that assertion, noting that the election process is not the place to record protest votes.
[T]he function of the election process is “to winnow out and finally reject all but the chosen candidates,” Storer, 415 U.S. at 735, 94 S.Ct. at 1281, not to provide a means of giving vent to “short-range political goals, pique or personal quarrels.” Ibid. Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently. Id., at 730, 94 S.Ct. at 1279. Accordingly, we have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive *128 activity at the polls. See [Munro v. Socialist Workers Party, 479 U.S. 189, 199, 107 S.Ct. 533, 539-540, 93 L.Ed.2d 499 (1986) ].... Petitioner offers no persuasive reason to depart from these precedents. Reasonable regulation of elections does uot require voters to espouse positions that they do not support; it does require them to act in a timely fashion if they wish to express their view in the voting booth.
Id. at 438, 112 S.Ct. 2059. The Court held that Hawaii’s ban on write-in voting “imposes only a limited burden on the voters’ rights to make free choices and to associate politically through the vote” and that because the burden was slight “the State need not establish a compelling interest to tip the constitutional scales in its direction.” Id. at 439, 112 S.Ct. 2059.
At oral argument before the Court, the Defendants compared the burdens imposed on Hawaiian voters by Hawaii’s blanket ban on write-in voting to the burdens imposed on Mohegan voters by Sections l-205(a) and l-206(e) of the Election Code. The Defendants argued that Sections l-205(a) and l-206(e) imposed a less severe burden on a voter’s free speech lights than Hawaii’s blanket ban on write-in voting, because if a tribal member cast one vote for each elective position available as required, he or she got to express a preference for at least one candidate and possibly several candidates, while the Hawaiian voter had no opportunity to express a preference for or to vote at all (because of the write-in ban) if his or her preferred candidate was not on the ballot. Therefore, the Defendants argued, since Bur-dick has held that Hawaii’s ban on write-in voting imposed only a limited burden on the right of voters to make free choices and to associate politically, and since the Tribe’s restriction imposes an even lesser burden, then the challenged provisions of the Election Code cannot impose a severe burden calling for the application of the strict scrutiny standard. The Court finds this argument persuasive.
Cases holding that voting restrictions placed a severe burden on First and Fourteenth Amendment rights, have had factual patterns making it virtually impossible to comply with ballot access requirements or with over burdensome voter registration requirements; or, the voting restrictions have unreasonably forced political associations to be made. See e.g. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (provision of Ohio elections law made it virtually impossible for a new party, even one with hundreds of thousands of members, to be placed on the ballot because it required the party to obtain signed petitions from qualified voters totaling 15% of the ballots cast in the previous gubernatorial election); Tashjian v. Republican Party of Conn., 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (state election law requiring Independent voters to publicly affiliate with a party before they could vote in primary imposed a severe burden on associational rights); California Democratic Party v. Jones, 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (California proposition which changed closed primary system to a blanket primary in which political parties were required to open up their candidate selection process to persons wholly unaffiliated with the party, resulted in a forced political association likely to change the parties’ message, and therefore constituted a severe burden on the party’s associational freedom). In contrast, the voting restrictions in this case placed only a limited burden on the Plaintiffs free speech rights; the Plaintiff could easily comply with the requirements in Section l-205(a) and 1—206(e)(2) and he was not entitled to use the election process as a means of *129 expressing his dissatisfaction with the candidates on the ballot.
In addition, the challenged provisions of the Election Code impose reasonable, non-discriminatory restrictions. “[Wjhen a state election law provision imposes only ‘reasonable, nondiscriminatory restrictions’ upon the First and Fourteenth Amendment rights of voters, ‘the State’s important regulatory interests are generally sufficient to justify the restrictions.’” Burdick, 504 U.S. at 434, 112 S.Ct. 2059. Hawaii’s prohibition on write-in ballots affected all voters who wanted to cast a write-in vote in an equal manner, regardless of their political affiliation or viewpoint, and created only a “limited burden on the voters’ rights to make free choices and associate politically through the vote.” Id. at 439, 112 S.Ct. 2059. The challenged Election Code provisions in this case, Sections l-205(a) and 1-206(e)(2), are also non-discriminatory restrictions on the right to vote. They affect every Tribal member who wants to vote in a Tribal election in the same manner regardless of their political affiliation or point of view. To have his or her vote counted, a tribal member must cast one vote for each elective position available.
The Supreme Court in Burdick next looked at the interests asserted by Hawaii to justify the burden imposed by the write-in voting prohibition. The Court determined that it would uphold Hawaii’s ban on write-in voting so long as it furthered an important governmental interest; and it held that the ban furthered such interest because “Hawaii’s interest in avoiding the possibility of unrestrained factionalism at the general election ... provides adequate justification for its ban on write-in voting in November.” Id. at 439, 112 S.Ct. 2059 (internal citations and quotations omitted). In addition, the Court noted that the ban was a legitimate means of averting divisive sore-loser candidacies, and guarding against “party raiding” by preventing disaffected voters from mounting a write in campaign for persons who had not filed in time or who had never intended to run for election. Id. at 439-40, 112 S.Ct. 2059.
The Court agrees with the Defendants that the facts of this case fall squarely within the ambit of Burdick. Memorandum of Law in Support of Motion For Summary Judgment, p. 11. The Tribal Council has retained a prohibition on bullet voting in its election ordinances in order to maintain Tribal cohesiveness and to prevent voting along only family lines. Fawcett Affidavit, ¶ 3. Preventing such factionalism is an important government objective that justifies a limited restriction on the right to vote. Burdick, 504 U.S. at 439, 112 S.Ct. 2059. In addition, the challenged provisions in the Election Code impose only reasonable, nondiscriminatory restrictions as in Burdick. Finally, the ban on bullet voting in the Election Code is reasonable because it has assisted the Tribe in “avoiding] the possibility of unrestrained factionalism at the general election.” Id. (emphasis added). It is possible that the prohibition on bullet voting would have the effect, in some cases, of discouraging voting along family lines and therefore encouraging tribal cohesiveness and unity. There is no requirement to show “elaborate, empirical verification of the weightiness of the State’s asserted justification.” Timmons, 520 U.S. at 364, 117 S.Ct. 1364.
In sum, the limited burden which the bullet voting prohibition places on the free speech rights of Tribal members is justified, because it furthers the Tribe’s important government interest in fostering tribal cohesiveness and avoiding the possibility of unrestrained factionalism.
*130 2. The Plaintiffs Equal Protection Claim also has no merit.
The Plaintiff alleges that Sections l-205(a) and l-206(e) also violate his right to equal protection under IGRA and Article XI, Section 1(h) of the Mohegan Constitution, by denying him “the opportunity to participate in the political process.”
The Equal Protection Clause directs that that “all persons similarly situated shall be treated alike”.... In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.... [W]e have treated as presumptively invidious those classifications that disadvantage a “suspect class” or that impinge under the exercise of a “fundamental right.” With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.
Plyler v. Doe, 457 U.S. 202, 216-217, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (citations omitted). Thus, “if a statute does not touch upon either a fundamental right or a suspect class, its classification need only be rationally related to some legitimate government purpose in order to withstand an equal protection challenge.” Batte-Holmgren v. Commissioner of Public Health, 281 Conn. 277, 295, 914 A.2d 996 (2007) (citation omitted).
Although the right to vote is generally considered a fundamental one, equal protection claims in the context of the right to vote have been judged according to the same “flexible standard” applied in Bur-dick for free speech claims. Crawford v. Marion County Election Board, 553 U.S. 181, 190, n. 8, 128 S.Ct. 1610, 1616, n. 8, 170 L.Ed.2d 574. To survive an equal protection challenge, then, any burden on the right to vote “must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.” Id. at 1616 (quoting Norman v. Reed, 502 U.S. 279, 288-89, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). In this case, the same important governmental interests in encouraging tribal cohesiveness and unity and in preventing unrestrained factionalism, are “sufficiently weighty to justify the limitation” on the Plaintiffs right to vote.
Further, the Plaintiff has not clearly articulated a claim that he is a member in a suspect class, such as his race, religion or national origin. The Plaintiff may be claiming that that “members of smaller families” in the Mohegan Tribe are a suspect class, but he provides no legal authority for such claim and therefore, the strict scrutiny standard is not applicable.
The prohibition on bullet voting in the Election Code serves the important governmental interests of encouraging tribal cohesiveness and unity and preventing unrestrained factionalism so as to justify the limited burden on the Plaintiffs equal protection rights.
3. There is no conflict between Sections l-205(a) and. l-206(e) of the Election Code and Article VII, Section ¿ of the Mohegan Constitution.
Article VII, Section 2 of the Mohegan Constitution provides that “[ijn each tribal election, every registered voting member shall be entitled to cast one vote for each elective position available.” The Plaintiff contends that Sections l-205(a) and 1-206(e) of the Election Code infringe on his rights under Article VII, Section 2 to cast one vote for each elective position available.
The meaning of the word “entitled” in Article VII, Section 2 is the key to *131 interpreting that provision in the Mohegan Constitution. In interpreting constitutions, “courts must rely heavily on its literal text and must give effect to its plain language to assure that constitutional provisions are given the effect their makers and adopters intended.” Pelt v. U.S. Bank Trust Nat. Ass’n, 359 F.3d 764, 767 (5th Cir.2004) (citations omitted). “The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary meaning as distinguished from technical meaning.” District of Columbia v. Heller, - U.S. -, -, 128 S.Ct. 2783, 2788, 171 L.Ed.2d 637 (2008) (quoting U.S. v. Sprague, 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640, (1931)).
The Defendants point to the normal and ordinary meaning of the word “entitled” (as the past tense of entitle): “to give a right or legal title to: qualify (one) for something: furnish with proper grounds for seeking or claiming something.” Webster’s Third New International Dictionary of the English Language (Unabridged) (2002 Ed.), at 758. “Entitled” has also been defined (as the past tense of entitle), as follows: “to give a right or claim to something; qualify.” Webster’s College Dictionary, Random House (2005). The plain language of Article VII, Section 2 qualifies tribal voters or gives them the right to “cast one vote for each elective position available.” The challenged provisions of the Election Code do not in any way restrict this right of tribal voters to “cast one vote for each elective position available,” because if they do so, their ballots will not be deemed spoiled and will be counted. Therefore, there is no conflict between Sections l-205(a) and l-206(e) of the Election Code and Article VII, Section 2 of the Mohegan Constitution.
4. There is no legal basis for the Plaintiff’s claim under A rticle XVII.
The Plaintiff contends that the enactment of Sections l-205(a) and l-206(e) of the Election Code violated the required procedures for amending the Mohegan Constitution in Article XVII. However, the mere existence of procedures in the Constitution for its amendment does not provide the Plaintiff with any legal basis for relief or any right to mandate that the amendment procedures be implemented.
III. CONCLUSION
The Plaintiff has failed to show that there is any genuine issue of material fact. For the foregoing reasons, the Defendants are entitled to judgment as a matter of law and their Motion For Summary Judgment is hereby granted.

. Article VII, Section 2 provides: “In each tribal election, every registered voting member shall be entitled to cast one vote for each elective position available."

. Article XI, Sections 1(a) and 1(h) provide as follows:
“The Mohegan Tribe, in exercising the powers of self-government, shall make no law inconsistent with The Indian Civil Rights Act of 1968 (25 use 1301-1303; 82 Stat. 77), which requires The Tribe not:
(a) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of people peaceably to assemble and to petition for a redress of grievances; . . . (h) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without the process of law.. ,

. Ordinance 95-6/15-1, Section 7.

. Interim Rule § !A(c) provides, in relevant part: “To the extent not inconsistent with the provisions of MTC § 1-1, et seq., the Gaming Disputes Rules of Civil Procedure shall apply to and be followed in actions now pending or hereafter brought to the Mohegan Tribal Court...."